[Cite as *State v. Barnes*, 2026-Ohio-2088.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115741 |
| v. | : | |
| DEANTAIE BARNES, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 4, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-25-701421-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Dominic Neville, Assistant Prosecuting Attorney, *for appellee.*

Eric M. Levy, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Appellant Deantaie Barnes ("Barnes") challenges his conviction of felonious assault, domestic violence, and aggravated menacing. He raises five assignments of error for our review:

1. The trial court erred by permitting the State to proceed forward with an evidence-based prosecution where it did not secure the presence of the victim T.G. for trial in violation of appellant's right to confront all witnesses against him pursuant to the Sixth Amendment to the United States Constitution and made applicable to the State of Ohio through the Fourteenth Amendment.

2. Appellant was denied the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution when trial counsel failed to object to the admission of hearsay evidence, including 911 calls, on scene statements, and Medical records, containing statements of the non-testifying victim and the failure to object otherwise constituted plain error.

3. The evidence was insufficient to support a conviction on each count for which appellant was convicted and sentenced.

4. The convictions were against the manifest weight of the evidence.

5. The State of Ohio committed prosecutorial misconduct in closing arguments by improperly vouching for the credibility of the non-testifying victim.

{¶ 2} After a thorough review of the applicable law and facts, we find that the evidence admitted did not violate Barnes's rights under the Confrontation Clause and did not constitute hearsay. In addition, his trial counsel was not ineffective for failing to make futile objections.

{¶ 3} We further find that Barnes's convictions were supported by sufficient evidence and not against the manifest weight of the evidence. We overrule the assignments of error and affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 4} On the night in question, a 911 call came in requesting EMS and police assistance for an assault. When Cleveland Emergency Medical Services ("EMS")

worker R.H. and her partner, A.M., had arrived on scene, they observed a male and a female exiting the apartment building to which they had been dispatched. The female, T.G., flagged them down, and the male left the scene.

{¶ 5} The EMS workers went into T.G.'s apartment with her. She told them what had happened, and they assessed her for injuries, noting that it looked as if her wrist might have been broken. (Tr. 186 and 198.) The EMS workers confirmed with T.G. that the male they had observed leaving the scene was the same male involved in the assault. (Tr. 186.) T.G. was concerned that Barnes had her keys and her phone, and she did not want him to come back. (Tr. 186-187.)

{¶ 6} After approximately 20 minutes on the scene, A.M. went outside to retrieve a phone from the ambulance so that T.G. could call her sister. When she came back into the apartment, she told R.H. that she had seen Barnes starting to walk back to the building. The EMS workers notified dispatch that the assailant was returning to the building. R.H. attempted to prevent Barnes from opening the door by putting her foot against the door, but he was able to push the door open. (Tr. 188 and 198.) The EMS workers asked Barnes to leave T.G.'s keys, and he began verbally threatening them, stating "I will f*cking kill you b*tches." (Tr. 199.) R.H. pushed the panic button on her radio.

{¶ 7} Barnes threw T.G.'s phone on the ground and left the building. (Tr. 193.) R.H. felt nervous and "extremely threatened." (Tr. 189.) A.M. felt "scared" because Barnes's demeanor was "very aggressive" at that time. (Tr. 199.)

A.M. was particularly concerned because Barnes had T.G.'s keys to the apartment building and they were not able to "barricade him out." (*Id.*)

{¶ 8} Cleveland Police Officer Sebastian Luongo ("Ofc. Luongo") received a call to respond to a female who had been assaulted by a male. EMS had reported that there was an ongoing altercation and had requested police assistance.

{¶ 9} Upon arriving at the residence, Ofc. Luongo encountered the two EMS workers and T.G. inside. One of the EMS workers told him that T.G. had stated that she had been assaulted by Barnes. (Tr. 165.) The EMS workers said that Barnes had run away from the scene and provided his description to the officer. (Tr. 163-164.) They also told the officer that Barnes had made verbal threats to them. (Tr. 165.) Ofc. Luongo learned that T.G. and Barnes had been in a dating relationship for several months and were living together. (Tr. 164.)

{¶ 10} Ofc. Luongo chased after Barnes. Cleveland Police Detective Raul Moyano ("Det. Moyano") was working as a patrolman on the night of the incident. He assisted in finding Barnes and apprehending him. The two officers caught up with Barnes and confirmed that he matched the description given by the EMS workers.

{¶ 11} T.G. identified Barnes as the person who had assaulted her. (Tr. 172.) The EMS workers "strongly suspected" that T.G.'s wrist was broken, and Ofc. Luongo observed a visible lump on the side of her head. (Tr. 172.) T.G. asked about her apartment keys, and Ofc. Luongo was able to locate them in Barnes's pants pocket. (Tr. 173-174.)

{¶ 12} Because the EMS workers were now victims in the case and could no longer provide care to T.G., a second ambulance came to transport T.G. to the hospital. (Tr. 190.) One of the EMS workers from the second ambulance completed a "patient care run report." The report stated:

> [Patient chief complaint] of head pain, left cheek pain, left wrist pain, vaginal pain, and has noted hematoma on right side of forehead, and noted controlled bleeding on lower lip secondary to assault. [Patient] states, "He was beating me with a chair," and states she was "stomped." [Patient] also says she was punched and kicked in the face, and kicked in the vagina. [Patient] says she had [loss of consciousness] during the incident. . . .

(State's exhibit No. 3.)

{¶ 13} Cleveland Police Detective Taylor Cunningham ("Det. Cunningham") was a domestic-violence detective and was assigned to the case. She contacted T.G. to ask if they could meet so she could obtain a written statement from her. T.G. stated that she was not able to meet with the detective because of her schedule. Det. Cunningham spoke with T.G. briefly over the phone, and T.G. corroborated her initial statements from the police report but did not elaborate. (Tr. 210.) After speaking with T.G., Det. Cunningham reviewed the 911 call and T.G.'s medical records. (Tr. 210 and 212.) She also reviewed Barnes's criminal history, which included a conviction for assault on a peace officer in 2019. (Tr. 217.)

{¶ 14} Barnes was indicted on three counts of strangulation, two felonies of the second degree and one felony of the third degree, in violation of R.C. 2903.18(B); one count of felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1); one count of domestic violence, a misdemeanor of the first

degree, in violation of R.C. 2919.25(A); and two counts of aggravated menacing, misdemeanors of the first degree, in violation of R.C. 2903.21(A). The first five counts related to T.G., while the two aggravated menacing charges concerned EMS workers R.H. and A.M.

{¶ 15} The matter proceeded to a jury trial; T.G. did not appear at the trial. Prior to commencement, Barnes objected to T.G.'s absence from the trial. He argued that his constitutional right to confront his accusers was violated when T.G. refused to appear despite the issuance of a subpoena. The court noted his objection for the record and trial commenced.

{¶ 16} The State presented the testimony of R.H., A.M., Ofc. Luongo, Det. Moyano, and Det. Cunningham. The State offered as exhibits the recording of the 911 call, T.G.'s medical records, the EMS run report, video footage from Ofc. Luongo's body camera, a screenshot from the body-camera footage depicting T.G. in the back of the ambulance, and the journal entry reflecting Barnes's prior conviction.

{¶ 17} At the conclusion of the State's case, Barnes moved for acquittal on all counts under Crim.R. 29; the court denied the motion. Barnes did not present any testimony or evidence. After resting, Barnes renewed his motion for acquittal, and it was again denied.

{¶ 18} The jury found Barnes not guilty of the strangulation counts, but guilty of the remaining charges. Barnes was sentenced to an aggregate sentence of four to six years. He then filed the instant appeal.

## II. Law and Argument

### A. Presence of Victim

{¶ 19} In his first assignment of error, Barnes argues that the trial court erred by allowing the State to prosecute him without securing the presence of the victim for trial. He asserts that his constitutional right to confront witnesses against him under the Sixth Amendment was violated because the State presented statements by T.G. through her medical records, the 911 call, and testimony of the police officers and EMS workers.

{¶ 20} The State contends that Barnes's Sixth Amendment rights were not violated because none of T.G.'s statements that were presented at trial were testimonial in nature.

{¶ 21} Typically, we review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 2016-Ohio-5735, ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010.). De novo review requires us to independently review the trial court's decision without any deference to its determination. *State v. McCullough*, 2018-Ohio-1967, ¶ 6 (8th Dist.), citing *State v. Knox*, 2016-Ohio-5519, ¶ 12 (8th Dist.). However, Barnes concedes that he did not object at trial to the admission of the exhibits containing statements by T.G. While he did lodge an initial objection to T.G.'s absence, he did not subsequently object to the admission of any of the State's exhibits or testimony. Under these circumstances, he has waived all but plain error on appeal. *See State v. Houston*, 2018-Ohio-3043, ¶ 25 (8th Dist.) ("We have applied the plain error doctrine to

instances where the appellant failed to object to an alleged confrontation clause error at trial.").

{¶ 22} "Crim.R. 52(B) provides that '[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.'" *Id.* Under the plain-error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

{¶ 23} The Sixth Amendment's Confrontation Clause, which is binding on the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

{¶ 24} Interpreting this amendment, the United States Supreme Court has recognized that the "admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *State v. Maxwell*, 2014-Ohio-1019, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The central concern of the Confrontation Clause is ""to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."" *State v. Smith*, 2019-Ohio-3257, ¶ 10 (1st

Dist.), quoting *State v. Madrigal*, 87 Ohio St.3d 378, 384, quoting *Maryland v. Craig,* 497 U.S. 836, 845 (1990).

{¶ 25} Because the Confrontation Clause is only implicated by testimonial hearsay, the admission of nontestimonial statements does not violate the Sixth Amendment. *McKelton*, 2016-Ohio-5735, at ¶ 185. Whether statements are testimonial or nontestimonial depends on the primary purpose of the statements. *Id.* In general, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). If, however, there is no such ongoing emergency and "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution," then the statements are testimonial. *Id.* In discussing the primary purpose test, the *Davis* Court explained that a 911 call, and usually the initial interrogation that is conducted in connection with the call, is not ordinarily designed primarily to establish or prove a past fact; rather, it is to describe current circumstances that require police assistance. *Id.* at 827.

{¶ 26} In *Michigan v. Bryant,* 562 U.S 344 (2011), the court clarified "what *Davis* meant" by "an ongoing emergency" and its role in determining the "primary purpose" of an interrogation. *Id.* at 359. The *Bryant* Court emphasized that "whether an emergency exists and is ongoing is a highly context-dependent inquiry."

*Id.* at 363. A court must consider "'the statements and actions of both the declarant and interrogators.'" *State v. Jones*, 2012-Ohio-5677, ¶ 155, quoting *Bryant* at 367.

{¶ 27} Whether a risk still exists to the victims, the public, or the police is an important factor in the "ongoing emergency" inquiry. The *Bryant* Court noted that "[d]omestic violence cases . . . often have a narrower zone of potential victims than cases involving threats to public safety." *Bryant* at 363. Nevertheless, the assessment of whether an ongoing emergency exists "cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.* The medical state of the victim "provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public." *Id.* at 365.

{¶ 28} Although the existence of an ongoing emergency is a significant factor in the primary-purpose analysis, "any conclusion determining that there is no ongoing emergency is not dispositive of the Confrontation Clause question." *State v. Williams*, 2024-Ohio-337, ¶ 26 (8th Dist.), citing *Cleveland v. Merritt*, 2016-Ohio-4693, ¶ 22 (8th Dist.). "Instead, 'whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015), quoting *Bryant* at 366. When considering the existence of an ongoing emergency and the primary-purpose test, the court should consider the formality or informality of the encounter and the statements and actions of the declarant and the interrogators,

particularly in light of the circumstances of the interrogation. *Merritt* at ¶ 42, citing *Clark* at 245 and *Bryant* at 360.

{¶ 29} With the foregoing principles in mind, we separately review the contents of the 911 call, the medical records, and the statements to police and the EMS workers. *See United States v. Arnold*, 486 F.3d 177, 189 (6th Cir. 2007) ("Each victim statement thus must be assessed on its own terms and in its own context to determine on which side of the [testimonial-nontestimonial] line it falls.").

### 1. 911 Call

{¶ 30} Barnes argues that the 911 call in this matter was testimonial because it was reporting a crime that had already concluded.

{¶ 31} This court has recognized that statements made during a 911 call are often found to be nontestimonial and are admissible if the statements satisfy a hearsay exception. *State v. Jacinto*, 2020-Ohio-3722, ¶ 61 (8th Dist.). This is because a 911 caller is typically "speaking about events as they [are] actually happening" and "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger," 911 callers are usually facing ongoing emergencies. (Emphasis deleted.) *Davis,* 547 U.S. at 827. Under such circumstances, the 911 caller is not testifying, the 911 caller is not acting as a witness, and the statements of the 911 caller are not testimonial in nature. *Id*. at 827-828.

{¶ 32} Viewing the contents of T.G.'s 911 call in its entirety, we find that T.G.'s statements to the dispatcher were made during an ongoing emergency and were nontestimonial. T.G. was distraught and continued to exhibit significant signs of

stress.  When questioned, T.G. indicated that she required both police and EMS assistance and the totality of the circumstances objectively indicate that her statements to the dispatcher were not made "to document past events" but were made with the "primary purpose" of obtaining protection and assistance in resolving an ongoing threat, particularly since Barnes still had her phone and keys.  Further, Barnes had returned to the apartment building and threatened the EMS workers. He then left but still had T.G.'s keys.

{¶ 33} Thus, Barnes posed an ongoing threat, and T.G.'s statements during the 911 call were nontestimonial and did not violate the Confrontation Clause.  *See, e.g., State v. Boyce*, 2024-Ohio-464, ¶ 18 (8th Dist.).

{¶ 34} Barnes further contends that the 911 call was inadmissible because it was not authenticated.  The call recording was introduced during Det. Cunningham's testimony as State's exhibit No. 1; the 911 dispatcher did not testify.  However, at the close of the State's case, the parties and the court discussed admission of the exhibits.  When discussing the 911 call, the following exchange occurred:

> PROSECUTOR:  So State's Exhibit 1 was the 9-1-1 call.
>
> I don't know if we put it on the record, but we can now, that there was a stipulation to the admissibility of the 9-1-1 call because of — so we did not have to bring a dispatcher in.
>
> THE COURT:  I do recall that.
>
> Counsel, does that sound accurate to you, there was a stipulation?
>
> DEFENSE COUNSEL:  That is correct, your Honor.

THE COURT: Okay.

{¶ 35} We conclude that the 911 call was properly admitted by the trial court.

## 2. Statements Made to Police

{¶ 36} Barnes argues that T.G.'s statements made on the scene and later to Det. Cunningham via phone were testimonial. However, Barnes does not cite any specific statements that the officers stated were made by T.G. Luongo testified to his own observations and what he learned from the EMS workers, R.H. and A.M.

{¶ 37} With regard to T.G.'s phone call with Det. Cunningham, the detective also did not offer any of T.G.'s statements during her testimony. She did state that T.G. had "corroborated" her previous statements made on scene. Even if this were to be considered testimonial, when reviewed for plain error, we cannot find that Barnes suffered any prejudice. The jury had already heard the testimony of the EMS workers and the responding officer as to the identity of the assailant and what had occurred; a statement that T.G. had "corroborated" her own past statements was duplicative. The trial court did not err in admitting testimony regarding T.G.'s statements to the police officers.

## 3. Medical Records

{¶ 38} Barnes contends that T.G.'s medical records from her treatment after the incident were also testimonial and should have been excluded. This argument lacks merit; the Ohio Supreme Court has held that statements elicited for purposes of medical diagnoses and treatment are not testimonial and that their admission

into evidence at trial does not violate the Confrontation Clause. *State v. Smith*, 2024-Ohio-5745, ¶ 54, citing *State v. Arnold*, 2010-Ohio-2742, ¶ 41.

{¶ 39} Similarly, "[s]tatements made for the purposes of medical diagnosis and treatment are a clearly defined, long-standing exception to the rules of hearsay." *State v. Echols*, 2015-Ohio-5138, ¶ 27 (8th Dist.). Evid.R. 803(4) allows for the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 40} The statements that were reflected in T.G.'s medical records were for the primary purpose of receiving medical care; those statements were nontestimonial and were properly admitted.

{¶ 41} Barnes further contends that T.G.'s statements in her medical records identifying him as her assailant were not admissible because they were not necessary for medical purposes. However, the records did not contain any identification of Barnes. The records referred to T.G.'s assailant as her "significant other" or "spouse." Accordingly, the records were not testimonial and did not contain hearsay. *See State v. Smith*, 2008-Ohio-5985 (8th Dist.) (statement in medical record did not identify the defendant where it only indicated that a "boyfriend" had hit the victim). Even if the statements referring to T.G.'s "spouse" (which is not even accurate) or "significant other" could be construed as identifying Barnes, the error

in the statements' admission was harmless under Crim.R. 52(A) because they were cumulative to the admissible testimony by the EMS workers and Ofc. Luongo.

{¶ 42} Barnes further argues that the medical records were improperly admitted through Cunningham, who was not involved in T.G.'s treatment. The medical records were presented during Det. Cunningham's testimony because she was outlining what she reviewed in her investigation of this matter.

{¶ 43} "[P]roperly authenticated medical records are admissible as business records under Evid.R. 803(6) without offending a defendant's right to confront witnesses because those records are not testimonial in nature." *State v. Alston*, 2015-Ohio-4127, ¶ 17 (9th Dist.), citing *State v. Tolbert*, 2010-Ohio-2864, ¶ 12 (9th Dist.).

{¶ 44} In addition, authenticated hospital records are generally admissible at trial. *State v. Congress*, 2006-Ohio-2081, ¶ 14 (8th Dist.), citing *Hunt v. Mayfield*, 65 Ohio App.3d 349 (1989). Under R.C. 2317.422, hospital records may be authenticated via certification by the custodian of the records and do not require live testimony at trial as to their preparation. "Admission of hospital records via R.C. 2317.422 certification does not offend a defendant's confrontation rights." *Id.*, citing *State v. Spikes*, 67 Ohio St.2d 405 (1981). Here, the medical records contained the certification required by R.C. 2317.422 and the records were admissible.

#### 4. Statements to EMS Workers

{¶ 45} Barnes argues that T.G.'s statements to the EMS workers were also testimonial because there was no ongoing emergency. He contends that T.G. was more interested in getting her keys back than medical treatment.

{¶ 46} The Ohio Supreme Court has held that "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford* [541 U.S. 36], because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." *State v. Muttart*, 2007-Ohio-5267, ¶ 63. The Court also noted that "[t]he fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change the fact that the statements were not made for the state's use." *Id.* at ¶ 62.

{¶ 47} T.G. was having her injuries assessed and actively receiving medical treatment when her statements were made to the EMS workers. Thus, her statements were for the primary purpose of receiving medical care, not for use at trial. *See Smith*, 2024-Ohio-5745, at ¶ 55.

{¶ 48} Barnes's first assignment of error is overruled.

### B. Ineffective Assistance of Counsel

{¶ 49} In his second assignment of error, Barnes argues that his counsel was ineffective by failing to object to the admission of hearsay testimony from the nontestifying victim.

{¶ 50} To prevail on an ineffective-assistance-of-counsel claim, an appellant must show that defense counsel's performance was deficient and that the deficient

performance prejudiced the defense, depriving the appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Defense counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Id.* at 688. In order to show prejudice, appellant must establish that, but for their trial counsel's errors, there is a reasonable probability that the result of the trial would have been different. *Id.* at 694. A reviewing court "need not address both prongs of *Strickland* if an appellant fails to prove either prong." *State v. Carter*, 2017-Ohio-8847, ¶ 27 (9th Dist.), citing *State v. Ray*, 2005-Ohio-4941, ¶ 10 (9th Dist.). In applying the *Strickland* test, courts must always recall that properly licensed counsel is presumed to be competent and trial counsel must be afforded deference regarding trial strategy. *In re Roque*, 2006-Ohio-7007, ¶ 11 (11th Dist.), citing *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 301, and *State v. Dixon*, 2004-Ohio-1585, ¶ 52.

{¶ 51} Because we have determined that T.G.'s statements were nontestimonial and properly admitted, any objection by defense counsel would have been futile. The failure to perform a futile act cannot be the basis for a claim of ineffective assistance of counsel nor could it be prejudicial. *State v. Kilbane*, 2014-Ohio-1228, ¶ 37 (8th Dist.), citing *State v. Ford*, 2007-Ohio-5722, ¶ 9 (8th Dist.), citing *State v. Henderson*, 2007-Ohio-2372 (8th Dist.); *see also State v. Mitchell*, 53 Ohio App.3d 117, 119 (8th Dist. 1988) ("[A] trial attorney does not violate any substantial duty in failing to make futile objections.").

{¶ 52} Barnes's counsel was not ineffective, and his second assignment of error is overruled.

### C. Sufficiency of the Evidence

{¶ 53} In his third assignment of error, Barnes argues that his convictions were not supported by sufficient evidence. Specifically, he asserts that he could not have been convicted of felonious assault, domestic violence, and aggravated menacing without direct testimony from the victim.

{¶ 54} "'[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed,' would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. McQuisition*, 2024-Ohio-3011, ¶ 25 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 55} A victim is not required to testify at trial because "[c]ases can be proven through other witnesses, evidence, circumstances, and inferences." *State v. Helman*, 2004-Ohio-4867 ¶ 21 (7th Dist.), citing *State v. Mayes*, 1979 Ohio App.

LEXIS 10090 (8th Dist. May 24, 1979); *see also State v. Hudson*, 2019-Ohio-3497, ¶ 31 (1st Dist.) ("There is no requirement that a victim testify at a trial, since a case can be proven through other evidence and witnesses.").

{¶ 56} In the instant matter, the State presented evidence of all of the elements of the offenses via the 911 call, the medical records, and the testimony of the responding officers, the EMS workers, and the detective. Viewing the evidence in a light most favorable to the State, we find that any rational trier of fact could have found the essential elements of felonious assault and domestic violence proven beyond a reasonable doubt even without testimony by T.G.

{¶ 57} With regard to the aggravated menacing charges, Barnes argues that the testimony of R.H. and A.M. failed to establish that he *knowingly* caused them to believe he would cause them serious physical harm.

{¶ 58} "Aggravated menacing does not require that the offender be able to carry out his threat or even believe himself capable of carrying it out; it is sufficient if the offender knowingly causes the victim to believe the offender will carry his threat into execution." *State v. Chopak*, 2012-Ohio-1537, ¶ 18 (8th Dist.), citing *State v. Walker*, 2007-Ohio-4047, ¶ 14 (8th Dist.). A person acts knowingly when he "is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The gist of the offense of aggravated menacing is the victim's reasonable belief that serious physical harm is about to befall him or her. *Chopak* at ¶ 18, citing *Walker* at ¶ 14.

{¶ 59} Here, Barnes threatened R.H. and A.M., saying that he was going to "f*cking kill you b*tches" and that they could "call the police. They won't stop me." (Tr. 188.) We find that there was sufficient evidence to demonstrate that Barnes knowingly caused R.H. and A.M. to believe that he would cause serious physical harm to them.

{¶ 60} Barnes's third assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 61} In his fourth assignment of error, Barnes argues that his convictions were against the manifest weight of the evidence. Specifically, he contends the jury had no opportunity to assess the credibility of T.G. and convicted him on a "paper trial." He further argues that the verdicts were logically inconsistent because the jury acquitted Barnes of the strangulation charges that were based upon the same evidence as the charges for which he was found guilty.

{¶ 62} When reviewing a manifest weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs

heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin* at 175.

{¶ 63} Again, there is no requirement that a victim testify in order to convict a defendant. And the jury had much more than a "paper trial." Both EMS workers testified, along with the responding officers, who all interacted with both Barnes and T.G. There was testimony as to the visible injuries on T.G. that was further supported by T.G.'s medical records. Finally, the jurors were able to hear the 911 call, where T.G. could clearly be heard asking for EMS and police, and then screaming, crying, and begging "Don't beat me no more," while having a difficult time catching her breath.

{¶ 64} We find that there was persuasive evidence presented of domestic violence and felonious assault. Even if we believed the verdicts to be inconsistent, inconsistent verdicts between independent counts do not create a reversible error. Because each count in an indictment is regarded as if it was a separate indictment, consistency in the verdict is not necessary. *United States v. Powell*, 469 U.S. 57, 62 (1984). "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, 446 (1997), quoting *Browning v. State*, 120 Ohio St. 62 (1929), at paragraph two of the syllabus. "[C]ourts have consistently rejected the argument that inconsistent verdicts would render a defendant's conviction against the manifest weight of the evidence." *State*

*v. Jones*, 2019-Ohio-5237, ¶ 33 (8th Dist.), citing *State v. Norman*, 2011-Ohio-2870, ¶ 14 (10th Dist.); *State v. Gravelle*, 2009-Ohio-1533, ¶ 76-77 (6th Dist.); *State v. Parker*, 2008-Ohio-3538, ¶ 22-25 (8th Dist.).

{¶ 65} Having reviewed the evidence presented at trial, we are not persuaded that the verdicts were against the manifest weight of the evidence. This is not the exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice. Barnes's fourth assignment of error is overruled.

### E. Prosecutorial Misconduct

{¶ 66} In his final assignment of error, Barnes argues that the State engaged in prosecutorial misconduct by improperly vouching for the credibility of the nontestifying victim during its closing argument. In particular, Barnes points to the following statements by the prosecutor:

> The only reason why this wouldn't be evidence is if she was just lying to [sic] these medical records, she's lying to EMS, she's lying to medical staff at the hospital.
>
> There's no – she's lying that she wanted — needed to even go to the hospital. Those aren't lies. She's revealing the truth.
>
> If this whole thing is that she wanted to put a case against the defendant, the reason why she lied to the medical professionals is because she wants some sort of vindictiveness, some sort of retribution against the defendant, she'd be here and testify. She would have followed up with the detective.
>
> The State of Ohio could present its case without the victim, and those medical records and the EMS run report check off the elements of strangulation and serious physical harm, and the 9-1-1 phone call allows you to be in the moment of that assault.

(Tr. 291.)

{¶ 67} We note that Barnes did not object to the allegedly improper statements and thus is limited to arguing plain error on appeal.

{¶ 68} The relevant question in reviewing a claim of prosecutorial misconduct is whether the comments made by the prosecutor ""so infected the trial with unfairness as to make the resulting conviction a denial of due process."" *State v. Froman*, 2020-Ohio-4523, ¶ 114, quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In answering that question, the reviewing court considers "whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights." *Id.*, citing *Maxwell*, 2014-Ohio-1019, at ¶ 243. In evaluating prejudice, the court considers "the effect that the misconduct had 'on the jury in the context of the entire trial.'" *Id.*, quoting *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993). "The focus of that inquiry is on the fairness of the trial, not the culpability of the prosecutor." *State v. Hostacky*, 2014-Ohio-2975, ¶ 42 (8th Dist.), citing *State v. Bey*, 85 Ohio St.3d 487, 493 (1999).

{¶ 69} Both the prosecution and the defense enjoy wide latitude in closing arguments as to what they believe the evidence has shown and what reasonable inferences may be drawn therefrom. *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). Moreover, prosecutorial misconduct constitutes reversible error only in rare instances. *Keenan* at 405, quoting *State v. DePew*, 38 Ohio St.3d 275, 288 (1988).

{¶ 70} With that latitude in mind, we still recognize that

[a] prosecutor is not allowed to express a personal opinion concerning the credibility of evidence, but can argue that the character, quality, or consistency of particular evidence or witnesses should be considered when assessing credibility.

*State v. Cody*, 2002-Ohio-7055, ¶ 35 (8th Dist.), citing *State v. Tyler*, 50 Ohio St.3d 24, 41 (1990). Although it is never advisable for a prosecutor to aver that a witness is telling the truth, upon reviewing the prosecutor's remarks in the context of the entire trial, we do not find that they prejudicially affected Barnes's substantial rights. The statements were made in the context of the prosecutor arguing that the victim did not have a motive to lie to the medical providers and that if T.G. had made up the incident to get Barnes in trouble, it is likely that she would have appeared to testify at trial.

{¶ 71} Moreover, the trial court instructed the jury that "[n]either opening statement of counsel, their remarks during the course of the trial, nor their arguments at the conclusion of the taking of evidence are to be considered by you as evidence in this case." (Tr. 147.) The jury is presumed to follow the instructions of the trial court. *State v. Banks*, 2015-Ohio-5413, ¶ 68 (8th Dist.), citing *State v. Loza*, 71 Ohio St.3d 61, 79 (1994).

{¶ 72} We cannot say that the cited statements by the prosecutor rose to the level of plain error. There is no evidence that, but for their admission, the outcome of the trial would have been different.

{¶ 73} Barnes's final assignment of error is overruled. The judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR